UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          Case No. 22-20600
                                              Honorable Victoria A. Roberts

TREMAINE JEVON LOVE,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE [ECF No. 20]

**I.   INTRODUCTION**

Without probable cause, reasonable suspicion or any exception to the warrant requirement in play, Oakland County sheriff deputies arrested Tremaine Jevon Love as a felon in possession of a firearm.

The Court **GRANTS** Love's motion to suppress evidence. [ECF No. 20]. No hearing is necessary.

**II.   BACKGROUND**

On August 17, 2022, Detectives Morrison and Webber of the Oakland County Sheriff's Office ("OCSO") conducted surveillance of the Primetime Liquor store in Pontiac, Michigan. They sat in a semi-marked patrol car in the parking lot of the Rite Aid drug store across the street from Primetime Liquor. [*See* Govt. Exhibit 1, Location 1, Aerial Map of Area]. OCSO

received complaints that individuals possessed firearms and sold drugs in the store's parking lot.

At approximately 7:45 p.m., the detectives observed a white Jeep Compass enter the lot and back into a parking spot near the front door. Love exited the driver's seat, walked behind the car, and entered the store. After several seconds, Love exited and in about eight seconds walked back to the front passenger window and opened the passenger door, where his girlfriend sat.  [*See* Gov. Exhibit 4 at 1:00-1:08, Video of Primetime Liquor Exterior Surveillance Camera].  Morrison says that during that time he used binoculars and saw a black magazine protruding from Love's front right pants pocket.  Once Love opened the passenger door, the detectives could no longer see the lower half of Love because the door blocked the view from their vantage point.  [*See id.*; Govt. Exhibit 1].  About 11 seconds after opening the passenger door, Love rearranged his shirt and pulled it down over his right pocket.  [*See* Govt. Exhibit 4 at 1:19].

Love spoke to his girlfriend for half a minute.  During that time, Morrison says he observed her point in the detective's direction; Love briefly looked that way before turning and walking again into the liquor store.  He remained there for a little over two minutes.  [*Id.*].

2

During that two minute span, Morrison moved the patrol car to University Drive into the middle turn lane, still facing the liquor store. [*See* Govt. Exhibit 1, Location 3]. This was the location of the patrol car when the dash camera video begins. [*See* Deft. Exhibit A, Dash Camera Video].

Morrison says he observed Love exit the liquor store, walk behind the Jeep, open the rear passenger door, and lean into the car, down towards the floorboard. Morrison states that based on training and experience, he and Webber suspected that Love removed the magazine from his pocket and hid a gun in the Jeep.

The evidence calls the detectives' account into question; while everything the detectives observed may not have been captured on camera, the evidence demonstrates that there were many obstacles between the patrol car and Love's car. [*See* Deft. Exhibit A; Govt. Exhibits 1 and 4]. Particularly, the dash camera video, video of the exterior of the liquor store, the aerial map [*see id*.], and the following screenshot of the dash camera video (with a red arrow indicating where Love's car is – behind another car) show that there are several parked and moving cars as well as trees between the patrol car and Love's car – all of which obstruct the detectives' view of Love's car when Love approaches his rear passenger door:

3



[Screenshot of Deft. Exhibit A at 0:01].

By the time the detectives entered the lot, Love and his girlfriend stood next to the Jeep. The detectives exited their patrol car and immediately placed Love in handcuffs and frisked him. Morrison asked Love about the location of the firearm. Love responded, "whatcha talking about?"; and Webber then placed Love in the back of the patrol car.

Morrison asked Love's girlfriend where the gun was; she denied knowing anything about a gun. An OCSO deputy handcuffed her and placed her in the patrol car.

Morrison began searching the car. He started with the front passenger seat. Then – in order – he searched the driver's seat, the rear driver's seat, and the trunk. Finally, Morrison searched the rear passenger seat. And before doing that, an OCSO deputy searched a trash receptacle next to the liquor store entrance.

While searching the car, Morrison stated into his radio that Love "ditched it [i.e., the magazine] somewhere; we're looking." [*See* Deft. Exhibit A at 3:32]. This statement and the order in which Morrison searched the car undermine the detectives' credibility.

If they observed Love place a magazine in the rear passenger seat as they claim they did, common sense and safety dictate that Morrison would have searched there first. But it was the last area Morrison got to. Morrison also would not have stated with uncertainty that Love must have ditched the magazine "*somewhere*."

Morrison found a gun on the right rear passenger floorboard. Deputies arrested Love and released his girlfriend at the scene. Following the arrest, the deputies determined that Love was a convicted felon and prohibited from possessing a firearm.

The in-scout video camera recorded Love making inculpatory statements. In a post-*Miranda* interview, Love admitted he possessed the firearm.

A federal grand jury returned an indictment charging Love with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

5

**III.     DISCUSSION**

Love moves to suppress the gun and his statements.  He argues that the officers did not have reasonable suspicion that he illegally carried a firearm.

The government says the detectives either had reasonable suspicion or they developed reasonable suspicion to detain Love and investigate after observing his actions.  Alternatively, the government argues that: (1) probable cause existed to search the car under the automobile exception; (2) the detectives were permitted to search the car incident to Love's arrest; and (3) the detectives could search the car under the exigent circumstances exception.  The Court addresses each of the government's arguments.

> **A.     The Detectives Did Not Have, Nor Did They Develop, Reasonable Suspicion**

An officer may briefly detain a person in an investigatory stop when they have reasonable suspicion that a suspect is engaged in a crime. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  "An officer can stop and briefly detain a person when the 'officer has reasonable, articulable suspicion that [the] person has been, is, or is about to be engaged in criminal activity.'" *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (citations and emphasis omitted).  "Reasonable suspicion requires only 'a moderate chance of

6

finding evidence of wrongdoing.'" *United States v. Hilton*, 625 Fed. Appx. 754, 758 (6th Cir. 2015) (citation omitted). "It requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citation omitted). When reviewing whether an officer had reasonable suspicion, courts consider the totality of the circumstances. *Id*. at 779.

While surveilling a liquor store parking lot from a Rite Aid parking lot across two streets (nine to ten lanes) of traffic, Morrison saw "a black object" [*see* ECF No. 29, PageID.134, 152] in Love's right pocket for approximately eight seconds, which he believed was a magazine. Love then entered and exited the store. Morrison says he saw Love lean into the rear passenger side of his car and place something on the floorboard. Yet, the evidence (i.e., the patrol car's heavily obstructed view from University Drive; Morrison's statement that Love ditched the magazine "*somewhere*"; and the order in which Morrison searched the car) undermines his credibility.

The government says that based on the facts, the detectives had reasonable suspicion that Love illegally carried a firearm in violation of MCL 750.227(2). That statute makes it unlawful to "carry a pistol concealed,"

7

either on one's person or in a vehicle, "without a license." *Id.* The government relies on this and the fact that the incriminating nature of a gun is immediately apparent under Michigan law, *see United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011), to support its argument that the detectives had reasonable suspicion that Love violated state law.

Importantly, the detectives did not observe Love possess a gun. They saw him with what they thought was a magazine. But possession of a magazine is not unlawful like possession of a gun, and unlike possession of a gun, the incriminating nature of possessing a magazine is not immediately apparent.

The fact that the detectives did not see Love in possession of a gun distinguishes this case from the multitude of cases the government relies upon. In each case the government cites, law enforcement either saw the defendant with a gun – on his person or in his car – or the defendant admitted he had a gun before they detained him. *See Galaviz*, 645 F.3d at 352, 355 (officers observed a gun in defendant's car before detaining him; suppression motion denied under automobile and plain view exceptions); *United States v. Graham*, No. 21-CR-20433, 2022 WL 4099447, at *4-6 (E.D. Mich. Sept. 7, 2022) (officers saw a gun on defendant and asked him if he had a concealed pistol license ("CPL") before detaining him); *United*

States v. Capozzoli, No. 22-20005, 2022 WL 3044818, at *5 (E.D. Mich. Aug. 2, 2022) ("Having seen a concealed weapon [on defendant's person], the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions. The officers did not search or seize Defendant's person immediately; rather, they approached Defendant and asked whether he had a CPL and a gun. When Defendant indicated he did not have a CPL but did have a gun, the officers had probable cause to arrest Defendant."); United States v. Mims, No. 20-20323, 2021 WL 6049406, at *3 (E.D. Mich. Dec. 21, 2021) (officers had reasonable suspicion to search defendant based on observing him "carr[ying] a weapon" – among other things); United States v. Stevenson, No. 21-20375, 2021 WL 5585921, at *1 (E.D. Mich. Nov. 30, 2021) (officers observed a firearm in defendant's vehicle before detaining him); United States v. Steen, No. 21-20012, 2021 WL 5036152, at *1 (E.D. Mich. Oct. 27, 2021) (officers observed defendant with a handgun before detaining him); United States v. Leverett, No. 19-cr-20098, ECF No. 36 (E.D. Mich. July 24, 2019) – (before seizure: (1) officer asked defendant if he had a gun on him and defendant said he did; and (2) officer asked to see defendant's CPL); United States v. Lamb, No. 16-20077, 2016 WL 4249193, at *1 (E.D. Mich. July 6, 2016), *report and*

9

*recommendation adopted*, No. 16-20077, 2016 WL 4191758 (E.D. Mich. Aug. 9, 2016) (officers saw defendant with a gun before detaining him).

In all of these cases, law enforcement observed a gun. Here they did not.

This case is more like *United States v. Floyd*, No. 21-CR-20010, 2021 WL 2805806 (E.D. Mich. July 6, 2021), *appeal dismissed*, No. 21-2803, 2021 WL 5365591 (6th Cir. Sept. 21, 2021). There, officers observed the defendant exit a liquor store with an extended magazine in his pants. *Id.* at *1. They approached the defendant and seized him immediately; they did not ask him if he was carrying a gun or if he had a CPL. *Id*. The court found that the officers violated the defendant's Fourth Amendment right to be secure against an unreasonable seizure and search, finding that unlike in *Terry*, *supra*, the defendant did not do anything to give officers reasonable suspicious that he was committing or about to commit a crime. *Floyd*, 2021 WL 2805806 at *2. Based on that violation, the court granted defendant's motion to suppress evidence. *Id.*

The government says the detectives developed reasonable suspicion based on the following:

> The first thing Love did, after he looked in [the detectives'] direction, was to quickly sidestep into the liquor store. When he exited, he walked to the front passenger's door and leaned in. A dark colored object is visible on his right hip. A second later, he

10

> pulled his t-shirt over the dark object. He reentered the store, stayed for over two minutes, exited, and walked directly to the passenger rear door. Standing at the rear door, he placed his right hand on his right side. At 4:08 in Gov. Ex. 4, Love appeared to lift his shirt, on the right side, remove something from his waistline, lean toward the right rear seat floorboard, and stand up to look around. When, minutes later, Morrison pulled up to Love, he saw the empty pocket which, just moments earlier, contained the magazine. The totality of Morrison's observations and Love's behavior established reasonable suspicion that Love possessed, then hid, the firearm.

[ECF No. 29, PageID.151 (internal citations omitted)]. The Court disagrees.

The Court finds that Love did nothing to give the detectives reasonable suspicion that he was illegally carrying a firearm. Many people who stop at convenience stores speak to their passengers before entering the store. And it is not uncommon for people to open their rear passenger doors and reach into backseats after shopping. Moreover, contrary to what the government says, Love did not "quickly sidestep" into the store immediately after looking in the detectives' direction.

Like the defendant in *Floyd*, the detectives did not observe Love possess a gun, and Love did not do anything to give the detectives reasonable suspicion that he was committing or about to commit a crime. *See Floyd*, 2021 WL 2805806 at *1. Nevertheless, the detectives seized

11

Love immediately. They never asked him whether he possessed a gun or had a CPL. *Id.*

Considering the totality of the circumstances, the detectives did not have or develop reasonable suspicion to detain Love and search him and his car.

**B. The Government's Other Arguments**

**i. The Detectives Did Not Have Probable Cause to Search Love's Car Under the Automobile Exception**

Next, the government says the search of the car was permissible under the automobile exception because after Love leaned into the rear backseat and no longer had the magazine protruding from his pocket, probable cause existed that a firearm was in Love's car.

Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment … permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). "The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (citation omitted); *United States v. Lyons*, 687 F.3d 754, 764 (6th Cir. 2012) ("Probable cause to search a

12

vehicle is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" (citation omitted)).

Considering that probable cause is a higher standard than reasonable suspicion, *see Lyons*, 687 F.3d at 763 n.3, the government's argument that the detectives had probable cause to believe a gun was in Love's car fails for the same reason as its last argument. Particularly, because the detectives never had reasonable suspicion that Love illegally carried a firearm, they did not have probable cause to believe that Love had a gun and placed it in the car, or that there was contraband otherwise in the car.

The search of the car was not permissible under the automobile exception.

### ii. The Detectives Were Not Permitted to Search the Car Incident to Love's Arrest

"Police may conduct a search of a vehicle incident to a *lawful* arrest 'when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020) (emphasis added) (citation omitted).

The government relies on this exception to justify the search of Love's car. But because the detectives lacked probable cause to arrest

13

Love, his arrest was not lawful, and the search was not permitted as a search incident to a lawful arrest.

### iii. The Exigent Circumstances Exception Does Not Apply

The government's final argument is that the detectives' search of Love's car was permissible under the exigent circumstances exception. This exception does not apply, either.

As the government acknowledges, for the exigent circumstances exception to apply, an officer "must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *See United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007).

Because the detectives lacked reasonable suspicion or probable cause to believe Love had a firearm, the exigent circumstances exception does not apply.

## IV. CONCLUSION

Because the detectives lacked reasonable suspicion and/or probable cause, the seizure of Love and search of Love and his car violated Love's Fourth Amendment right to be free from unreasonable searches and seizures.

14

The Court **GRANTS** Love's motion [ECF No. 20] and suppresses the gun and any statements Love made to law enforcement officers as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963).

**IT IS ORDERED**.

s/ Victoria A. Roberts  
Victoria A. Roberts  
United States District Judge

Dated: 5/31/2023